# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 00 C 3465 | DATE | 5/20/2002 |
| CASE TITLE | Tyrone Hines vs. Anthony Principi | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached Memorandum and Opinion, the defendant's motion for summary judgement is GRANTED. [Doc. #27]. This case is closed and any and all remaining motions are rendered moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | MAY 23 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| X | Docketing to mail notices. | | | 32 |
| X | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| vg(lc) | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice  mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

Tyrone Hines,

    Plaintiff,

v.

Anthony Principi,
Secretary of Veterans Affairs

    Defendant.

No. 01 C 3465

HONORABLE DAVID H. COAR

DOCKETED
MAY 2 3 2002

## MEMORANDUM OPINION AND ORDER

Before this court is defendant's, Anthony Principi ("Principi"),[1] by his attorney, Patrick J. Fitzgerald, United States Attorney for the Northern District of Illinois, motion for summary judgement against all claims alleged by plaintiff, Tyrone Hines ("Hines") in this action. For the following reasons, the defendant's motion is granted.

## Background

Hines began working as a computer programmer for the Veteran's Administration ("VA") in February 1995. Hines is an African-American male and describes himself as a Moslem. He is legally blind, having lost more than half of his vision, however, he has appeared in court without assistance or aids.

Hines was hired by the VA as a GS-9, and remained in that pay grade throughout his tenure with the VA. He began his career with the VA working in the Central Processing Service

---

[1] Anthony Principi has replaced Togo West as the Secretary of Veterans Affairs. Accordingly, Mr. Principi is substituted automatically as the defendant in this action pursuant to Fed.R.Civ.P. 25(d)(1).

1

group (CPS) where he was supervised by Bill Meyers. While working for CPS, he wrote applications primarily using Visual Basic computer language. He spent about a year and a half in CPS and then was transferred to the on-line section of the Compensation and Pension Division (C&P).

Lester Wozniak ("Wozniak") served as the Manager of the on-line section in C&P. Wozniak is a Caucasian male. In C&P, programmers work under the direct supervision of more senior programmers, referred to as senior analysts, until they are judged capable of working on their own. Analysts are responsible for guiding the programmers and teaching them to do their job. Wozniak compares the relationship between the analysts and the more junior programmers to the relationship between an apprentice and a master electrician; the programmer is expected to follow an analyst's instructions so he can learn how to do the job.

Two of the senior analysts in C&P were Martin Menchey ("Menchey") and Cynthia Ross ("Ross"). Menchey is a GS-13 who has been employed by the VA since approximately 1980 or 1981. He has been a senior analyst since about 1994. Menchey is a Caucasian male and describes himself as a Lutheran. Ross is a GS-12 who has worked for the VA since March 1987. She has been a senior analyst since approximately 1995 or 1996. Ross is an African-American female who describes herself as a Baptist.

Analysts hand out the assignments in C&P. The programmers report directly to the analysts regarding their progress on the assignments and would receive direct supervision from the analysts. In addition to completing the program assignments given to them, programmers in C&P also are required to do certain clerical work as part of their job. The programmers are required complete forms and paperwork used to establish a trail to make sure the program is completed properly. All

programmers are required to perform these clerical tasks.

During the time that Hines worked in C&P, there were about 19 people in the group. Six of these employees were African-American, three were Hispanic, and the remainder were Caucasian.

After joining C&P, Hines was given an assignment to prepare a program using Visual Basics. He worked on this project for three months. After completing that project, he was given various assignments using the programming language COBOL, which he worked on for about 6 months.

According to Hines, after completing those projects, he received fewer programming assignments and began to receive more clerical assignments. Hines stated that other programmers who were not African-Americans received assignments and did more actual programming work than he did. Hines claims that he did not receive the type of work he needed to perform to learn his position and advance to a higher grade because he received more clerical projects than programming assignments,

Hines and Ross worked together often. Ross believes that her working relationship deteriorated to the point that nearly every time Ross told Hines to do something, he would dispute it. Hines occasionally talked to Menchey when he disagreed with what Ross had told him to do. Mechey believes that Hines did not seem to like working with Ross and did not seem to want to believe what she told him to do. Menchey states that Hines approached him about instructions he received from Ross in order to obtain confirmation about what Ross had told Hines,. Further, according to Menchey, Hines seemed to accept the directions from Menchey whereas he would not accept them from Ross.

In early 1999, Hines was assigned a project called the customer survey count that required him to write a program using COBOL. Although the final certified copy of the project specifications

3

were given to Hines in February 1999, he was provided draft copies of the specifications prior to that so he could start working on the project. Hines was supposed to complete the project by March 15, 1999 and the program was to be placed into production by April 1, 1999. Prior to beginning production, auditors had to examine the program to ensure that it met all specifications. Menchey was the lead analyst for the customer survey count project, but Ross was assigned to the project as well and served as Hines's primary supervisor.

According to Hines, he had trouble completing the project because required information was not included in the specifications Ross provided him. Hines claims Ross did not give him all the written information he needed to complete the project until three months after he started on it. Both Ross and Menchey deny that Ross withheld anything, and claim that Hines was given all the information he needed from the outset. Ross admits there were written amendments and modifications to the assignment, but claims she told Hines about these either verbally or in writing before the formal amendments were issued to make sure he had the information he needed to complete the assignment.

Hines claims that Ross, in addition to withholding information from him, also hindered his development as a programmer by not allowing him to test his program. While drafting a program, it is typical to test the program to determine whether it works by running it using Job Control Language, or JCL. Hines claims it is unusual for the programmer who drafted the project to be denied access to JCL to test his program.

Ross admits that she did not allow Hines to test his program on the customer count survey project in part because she had asked him to keep her informed as he completed segments of the job and he was not doing so. She performed the testing herself. Hines claims Ross told him he could

4

not test the program because he was working too slowly. As Hines progressed further in drafting the project, Ross and Menehey both claim he was allowed to test the project himself. Menchey recalls that when Hines tested his program, it went into a "loop" meaning the program kept processing information but did not produce any output until finally it aborted. Ross also claims that she allowed Hines to test other programs that he wrote.

Hines claims Ross told him he was too slow in completing his projects due to his vision impairment. Ross claims that she allowed extra time to compensate for Hines's limited vision when scheduling deadlines for his projects, but that he still had trouble completing the work on time. Ross did not believe Hines's problems in completing his work were related to his vision. Instead, Ross felt Hines took a long time to complete his projects because he did not want-to carry out instructions that Ross had given him. Wozniak also denied ever telling Hines he worked too slowly due to his vision. Wozniak does recall talking to Hines about his disability, but he states that those conversations focused on whether Hines had sufficient accommodations to complete his work. Wozniak assumed Hines's accommodations were sufficient because Hines never complained to him about them.

Hines believes Wozniak or Wozniak's boss, Tom Jacobs, forced Ross to behave the way she did towards Hines. Hines also concludes, from Wozniak's loyalty to Ross, that Wozniak was motivated against Hines based on his race and religion. Although Hines believes his supervisors would have heard that he was a Moslem through office gossip, he cannot say for certain whether they knew his religion. Wozniak denies knowing that Hines was a Moslem. Menchey also claims that he was not aware of Hines's religious beliefs.

Hines believes he was given the customer survey count project to determine whether he was

ready to advance to GS-11. According to Wozniak, Hines was not under consideration for a promotion and never applied for a position as a GS-11.

Wozniak recalls having two or three conversations with Hines regarding Hines's desire to be promoted to a GS-11. According to Wozniak, he told Hines he needed to become more independent and more proficient at writing programs in COBOL, and that he would have to complete his assignments more quickly before he could be promoted. Wozniak also told Hines that if he became more proficient, he would consider him for a promotion toGS-11.

Menchey believed Hines needed to improve his skills as well because, although Hines said he was proficient in COBOL, the program he drafted for the customer count survey project would not work. Further, Hines was given an assignment to examine portions of COBOL programs to make sure they were Y2K compliant. One of the modules that Hines reviewed had an error in it that caused problems after January 1, 2000, and Hines apparently missed the error and failed to correct it. Menchey believes somebody who was proficient in COBOL would have caught the error that Hines missed. Wozniak expected Hines to become more proficient by working with experienced programmers to gain on-the-job training.

Although he did not consider Hines ready to advance to GS-11, Wozniak believed Hines's performance was acceptable at the GS-9 level. Wozniak also stated that nobody ever decided not to promote Hines. The decision of whether to promote a programmer is made by Wozniak's supervisor, Tom Jacobs, based in part on Wozniak's recommendation.

In May 1999, Hines was absent from work for approximately two weeks due to complications associated with sickle cell anemia. According to Hines, he contacted Wozniak and told him he would be out of the office for a week. Hines claims he did not know he would be out for more than

6

one week. Before Hines returned to work, Tom Jacobs ("Jacobs") instructed him that he would have to provide documentation explaining his absence and have his doctor provide a note clearing him to return to work.

After he returned to work, Wozniak reminded Hines that he needed to bring in a doctor's statement, and that if he failed to do so he would be treated as AWOL for the duration of his absence. According to Wozniak, Hines responded that he could not provide the document and understood that there may be consequences. Based on his failure to explain his absence properly, and his failure to properly report that he would be out sick, Hines was issued a letter of reprimand. Hines received no further punishment and was entitled to have the letter removed from his employment file after three years.

On May 3, 1999, Hines contacted an EEOC Counselor. On June 3, 1999, Hines filed a formal administrative complaint alleging he was discriminated against due to his race and his disability. On June 4, 1999, Hines resigned from the VA. During the investigation of his complaint, Hines added allegations that he was discriminated against based on his religion, and that he was constructively discharged.

## Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Michael v. St. Joseph County, et. al, 259 F.3d 842, 845 (7th Cir.2001). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable

inferences drawn from it in a light most favorable to the non- movant, a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir.1995).

Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant must respond to the motion with evidence setting forth specific facts showing that there is a genuine issue for trial. See Fed.R.Civ.P. 56(e); Michael, 259 F.3d at 845; Albiero v. City of Kankakee, 246 F .3d 927, 932 (7th Cir.2001). To successfully oppose the motion for summary judgment, the non-movant must do more than raise a "metaphysical doubt" as to the material facts, see Wolf v. Northwest Ind. Symphony Soc'y, 250 F.3d 1136, 1141 (7th Cir.2001) (citation and quotation omitted), and instead must present definite, competent evidence to rebut the motion, see Albiero, 246 F.3d at 932. Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial."Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986); A scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non- movant]." Anderson, 477 U.S. at 250, 106 S.Ct. at 2511.

## Discussion

In setting forth an employment discrimination claim, a plaintiff may pursue two distinct evidentiary paths. Kormoczy v. Secretary, U.S. Dept. of HUD, 53 F.3d 821, 824 (7th Cir.1995). On the one hand, he may choose to present direct evidence of discriminatory intent. Essex v.

8

United Parcel Service, 111 F.3d 1304, 1308 (7th Cir.1997). Alternatively, he may utilize an indirect method to raise an inference of an illegal motive, which involves a burden-shifting method established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S.Ct. 1817 (1973).

Under the McDonnell Douglas framework, the plaintiff bears the initial burden of proving a prima facie case of racial discrimination. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. at 1824. Accordingly, he must demonstrate that (1) he is a member of a protected class; (2) he was performing his job well enough to meet his employer's legitimate expectations; (3) he suffered an adverse employment action (discharge); and (4) his employer treated similarly situated employees outside his classification more favorably. Logan v. Kautex Textron North America, 259 F.3d 635, 639 (7th Cir.2001); Oates v. Discovery Zone, 116 F.3d 1161, 1171-72 (7th Cir.1997); Hughes v. Brown, 20 F.3d 745, 746-47 (7th Cir.1994). Establishing this prima facie case creates a rebuttable presumption of discrimination. Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 722 (7th Cir.1998).

The burden of production then shifts to the employer to articulate legitimate, non-discriminatory reasons for the challenged action. Id. The explanation must be legally sufficient to justify a judgement in the employer's favor. Kirk v. Fed. Prop. Mgmt. Corp., 22 F.3d 135, 138 (7th Cir.1994) (citing Tex. Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 255, 101 S.Ct. 1089, 1094 (1981)). If the employer satisfies this burden, the presumption of discrimination dissolves, and the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the reasons proffered by his employer are actually pretext for discrimination. Id.; see also

In this case, the plaintiff neither presents direct evidence of discriminatory intent nor

demonstrates a prima facie case of racial discrimination. Specifically, Hines does not show that he suffered an adverse employment action.

An adverse employment decision is actionable under Title VII only if it is one that is materially adverse, meaning an employee must suffer something "more than a mere inconvenience or an alteration of job responsibilities." Krause v.City of La Crosse, 246 F.3d 995, 1001 (7th Cir. 2001); Smart v. Ball State Univ., 89 F.3d 437,441 (7th Cir. 1996).

Hines contends that he was frustrated in his job.[2] And Hines generally argues that Ross's treatment of him caused him to be passed over for a promotion and that he was forced to resign.

In order to prove his failure to promote claim, a plaintiff must show that he performed his job satisfactorily, applied for the new job, and was qualified for the new job. Kirk v. Federal Property Management Corp., 22 F.3d 135, 138 (7th Cir. 1994). While Hines performed his job satisfactorily, but he never actually applied for a new job. And although Hines had the impression that he was given the customer count survey assignment as a test to determine whether he should be promoted, there is no basis for that belief. Both Ross and Wozniak denied that Hines was under consideration for a promotion at the time he was working on that project. Hines's unsubstantiated belief alone cannot create a material issue of fact on this question. See Schultz v. G.E. Capital Corp., 37 F.3d 329, 334 (7th Cir. 1994) (employee's self-serving remarks alone are insufficient to raise doubts regarding the credence of employer's explanation).

While Hines was not under consideration for an opening at the time, Wozniak did tell Hines that he needed to improve his proficiency in COBOL programming and become more

---

[2] Hines received a letter of reprimand for his unexplained absences, but a letter of reprimand does not rise to the level of an adverse job action for Title VII purposes. Krause v. City of La Crosse, 246 F.3d 995, 1000 (7th Cir. 2001).

independent, before he could qualify for a promotion. Again, Hines's self-assessment of his skills is insufficient to create a genuine issue of fact as to whether he was qualified for a promotion. Gustovich v. AT&T Communications, Inc., 972 F.2d 845, 848 (7th Cir. 1992). Since Hines is unable to prove that he applied for a promotion, or that he was qualified for one, the defendant is entitled to summary judgment.

## Conclusion

For the foregoing reasons, the defendant's motion for summary judgement is GRANTED.

**Enter:**

**David H. Coar**

**United States District Judge**